Dick HAKEN, Appellee,

v.

HARPER OIL COMPANY, an Oklahoma Corporation, and Bonray Drilling Company, an Oklahoma Corporation, Appellants.

No. 51773.

Court of Appeals of Oklahoma, Division No. 2.

June 12, 1979.

Released for Publication by Order of Court of Appeals July 5, 1979.

---

7. See, *In re Integration of State Bar of Oklahoma,* supra.

L. Lee Ingraham, Enid, for appellee.

Norman L. Russell, Oklahoma City, for appellants.

BRIGHTMIRE, Judge.

The decisive question here is whether or not the trial court's decree—requiring lessees under an oil and gas lease to develop within 180 days or suffer cancellation of the lease—is clearly against the weight of the evidence.

I

The dispute was submitted to the court for decision based upon stipulated facts. Lessor owns a quarter section of land in Garfield County. On February 27, 1976, that section became the subject of an oil and gas lease—apparently a producer's 88 executed form—in favor of Harper Oil Co.

for a primary term of three years. Apparently, Harper sought the lease after drilling had ended—on February 11, 1976—on a well (Knopfel No. 1) located on a quarter section adjoining the Haken's quarter to the southwest. Knopfel No. 1 was officially completed on March 7, and an initial production test on March 21, 1976 resulted in a flow rate of 99 barrels of oil and 156 MCF of gas a day.

On May 8, 1976, Harper completed a well (Bonnie No. 1) to the Mississippi Lime at a depth of 5478 to 5862 feet. Bonnie No. 1 was located some 660 feet south of the Haken quarter and achieved an initial production rate of 82 barrels of oil and 480 MCF of gas a day.

On July 1, 1976, Aggie Oil Company completed a well (Weinkauf No. 1) to the Mississippi. That well was located about 660 feet to the east of the Haken land and its initial test achieved a production rate of 46 barrels of oil and 335 MCF of gas per day.

On August, 27, 1976, Harper completed another producing well (Clive No. 1) about three-quarters of a mile southwest of the Haken acreage. Initial test production was 149 barrels of oil and 353 MCF gas daily.

Finally, on October 11, 1976, Jet Oil Company completed a well (State "G" No. 1) that was located about two-thirds of a mile southwest of the Haken land and whose initial daily production rate was 200 barrels of oil and 380 MCF of gas.

In the meantime, on Haken's 160 acres which lay in the midst of all this Mississippi Lime formation production activity, Harper had undertaken to drill not a single well. So, on December 21, 1976, Haken had his lawyers write Harper and demand that it immediately comply with the implied covenant to protect his land from drainage or else release the lease. Harper did not respond and on January 26, 1977, Haken made a second written demand. On February 8, 1977, Harper's attorney wrote saying he had checked the matter out and that the production of Harper's Bonnie No. 1 offsetting Haken's land to the south had "steadily declined and we do not think it is a commercial well," and "we are unable to obtain any production data on the Weinkauf No. 1 well offsetting Haken's tract to the east." "Based upon our present information," continued the lawyer, "we believe very little drainage is occurring . . . at this time to justify the drilling of an offset well."

Consequently, on May 25, 1977, this lawsuit was filed against Harper and its assignee of a half interest in the lease, Bonray Drilling Company. Defendants answered with a general denial.

## II

The matter came on for trial on November 28, 1977. As evidence plaintiff offered the lease, copies of drilling and production data that had been filed with the corporation commission concerning each of the wells mentioned earlier, copies of his demand letters, and the letter he had received from Harper's lawyers refusing to drill. Defendants stipulated to their admission and plaintiff rested. Defendants demurred to plaintiff's evidence and moved "for a directed verdict," i. e. for judgment. Both demurrer and motion were overruled. Defendants elected to stand on their demurrer. The court found plaintiff had presented evidence sufficient to prove a "prima facie case," and therefore, he was entitled to judgment.

## III

Defendants argue that their demurrer should have been sustained because plaintiff's evidence completely failed to prove two essential elements: (1) that substantial drainage was occurring and (2) that an offset well would produce oil or gas in paying quantities.

■ In cases of equitable cognizance such as the one here, the prima facie case test is not applicable, but the court must treat a demurrer to the evidence as a motion for judgment and weigh plaintiff's evidence. *Sellers v. Sellers*, Okl., 428 P.2d 230 (1967); *Connelly v. Gaffaney*, 159 Okl. 60, 14 P.2d 391 (1932). If, after doing this, the court finds that the clear weight of the

evidence appears to be against the plaintiff in regard to one or more of the essential elements of his case, then the court should render judgment for defendant. If, however, the weight favors plaintiff then defendant's motion for judgment should be overruled and defendant afforded an opportunity to adduce countervailing evidence. Of course, if plaintiff has failed to present evidence sufficient to sustain a cause of action, a judgment in his favor would clearly be against the weight of the evidence and, therefore, be subject to reversal.

In the instant case, the trial judge did not purport to weigh the evidence but in effect concluded that plaintiff had presented sufficient evidence to at least sustain his cause of action as though it were an action of legal cognizance. When defendant in turn declined to go forward with countervailing evidence, the court then decided plaintiff was entitled to judgment.

So to resolve the matter, we have to examine plaintiff's evidence, weigh it, and determine whether the weight of it favors the rendition of a judgment for plaintiff.

■ It is conceded that under the written terms of the three year lease defendants had no express obligation to drill a well during the first year nor were they so obligated during the next two years if $160 delay rentals were paid. But as with all such mineral leases, the law adds to the lease by inferring that several additional covenants have been made between the parties. One such covenant is that lessees will, by drilling offset wells, protect lessor's land from drainage through wells on adjoining lands. *Eastern Oil Co. v. Beatty*, 71 Okl. 275, 177 P. 104 (1918).

■ The scope of lessees' implied obligation in this respect, according to *Beatty*, is narrowed to the exercise of reasonable care and diligence to prevent *substantial* drainage from the leased lands by drilling offsets. Reasonable care and diligence was later defined in *Broswood Oil & Gas Co. v. Mary Oil & Gas Co.*, 164 Okl. 200, 23 P.2d 387 (1933) as being that which would be used by a reasonably prudent operator under all the circumstances of a particular situation. Of course, as *Beatty* points out, one significant circumstance is whether or not the adjoining lease is producing oil or gas in paying quantities. If it is not, then there is no duty to offset. Or, even if the adjoining well is producing in paying quantities, the duty to offset still does not arise unless a reasonably prudent operator would anticipate that the offset well would also be a profitable producer. *North American Petroleum Co. v. Knight*, Okl., 321 P.2d 964 (1958). *Knight* held that the burden of proving what a reasonably prudent operator would do rests ordinarily upon the one seeking cancellation of the lease. Appended to this general rule, however, is the result reached in *Dixon v. Anadarko Production Company*, Okl., 505 P.2d 1394 (1973) that because of his superior knowledge the lessee operating a well on adjacent land has the burden of excusing a significant delay in drilling an offset well.

IV

Plaintiff has alleged and proved that his land likely lies within the producing zone of the pool in question; that initial tests on some four nearby wells drilled on adjacent land resulted in production of from 46 to 200 barrels of oil a day per well and a total of nearly a trillion cubic feet of natural gas per day; that a few months after the producing wells were completed, lessor made two written demands on lessee to offset because of the "probability of drainage;" that lessees admit some "drainage is occurring" but that it is "very little" and "not enough . . . to justify the drilling of an offset well;" that lessees assert that production of one of the adjacent wells— Bonnie No. 1—has "steadily declined" and defendant, Harper Oil Co., is of the opinion it is "not . . . a commercial well."

■ While it is admitted there is some drainage by defendants, there is no direct evidence that substantial drainage is probably taking place nor is there evidence that a prudent operator would conclude that an offset well would be a profitable venture. To find these two essential facts, the fact-

finder has to rely on inferences drawn from the stipulated evidence we have described. A majority of this court are of the opinion that both facts are reasonably inferable from this evidence and that the clear weight of the evidence requires the inferences to be drawn.[1] *McConnell v. Oklahoma Gas and Electric Co.*, 563 P.2d 632 (1977); *Gypsy Oil Co. v. Ginn*, 152 Okl. 30, 3 P.2d 714 (1931).

Since defendants admit some "drainage is occurring" to plaintiff's land, i. e. an admission that the Mississippi Lime sand is under plaintiff's land, inferences which can be drawn from the evidence, say the majority, are: (1) that wells on adjacent lands are producing in paying quantities; (2) that an offset well on lessor's land would probably be profitable; and (3) that substantial drainage is occurring not only through defendants' wells but also through others in the area under the circumstances which include, among other things, the initial test data indicating production at the rate of 330 barrels of oil and nearly one trillion cubic feet of gas daily. Such findings furnish an adequate foundation for the cancellation of the lease in question.

The judgment appealed is not clearly against the weight of the evidence and is therefore affirmed.

BACON, P. J., and NEPTUNE, J., concur.

---

[1] The writer does not share this view. There is no evidence of the production history of the wells in the area nor has it ever been shown that the wells were producing at time of trial. There is no evidence of what the drainage range of wells in the Mississippi Lime strata near plaintiff's property is. Under these circumstances, I cannot infer that the two wells located 660 feet away from plaintiff's property, if producing are draining substantial oil from beneath the surface of plaintiff's land nor that a well could have been profitably drilled on plaintiff's land *at the time of trial*.

I do, however, agree with the result achieved by the majority because I think that, under the circumstances the lessee should not be able to retain the lease on plaintiff's land while it drains oil from under it through its own adjoining robber well even if such drainage is "very little." Under the particular facts here, the *Dixon* rationale ought to obtain, and once plaintiff shows some drainage, the burden should be shifted to the party having "superior" knowledge of the facts to show (1) that there is no drainage and (2) that a prudent operator would not drill on plaintiff's land because it probably would not be a profitable venture. Actually, when one gets right down to it fundamental fairness dictates that Harper Oil Company should either drill on plaintiff's tract or release the lease.