## CONNELLY v. GAFFANEY et al.

No. 19783. Opinion Filed Sept. 13, 1932.

Streeter Speakman and H. M. Jarrett for plaintiff in error.

Clyde L. Andrews, for defendants in error.

HEFNER, J. Alexander Connelley, as plaintiff, brought this suit against Grace Gaffaney, Charles T. Connelly, Theresa Connelly, and Edgar Connelly, four of his children by a second marriage, and others, as defendants, to cancel certain deeds of conveyance and to quiet the title to the lands therein conveyed in himself.

The evidence discloses that he was a Sac and Fox Indian, about 80 years of age. He had been selected as a member of the business committee of the tribe and had served quite a long time as such; he was one of the three men who had charge of the business affairs of that tribe. He had received an allotment of 160 acres of land as his portion of the lands of the tribe. He married and had a daughter by that marriage, which daughter had received an allotment. His first wife died and he married again and there were four children by the second marriage, none of whom received an allotment for the reason that the land had all been allotted prior to their birth. After the death of the second wife, he sold her allotment, paid all the expenses of her illness, and purchased 70 acres of land with the balance of the money. He had mortgaged all of his land for $900. He owned a small house in the village of the Sac and Fox Agency, in which he and his four children by the second wife lived. Two of the children were girls and two were boys. The boys worked away from home and at times worked on the land, and the girls stayed at home and took care of it and their father. The daughter by the first wife lived in Drumright.

The plaintiff's third marriage was to a young white woman 23 years of age, and the record discloses that she had been guilty of selling whisky. On marriage to her, plaintiff left his home and the home of his children and went to live with his third wife in the house she had rented about a quarter of a mile north of the home of the children. The children objected to his marriage, and shortly thereafter two of them asked him to get in a car with them and they took him to Cushing, where the two boys were working. When they arrived there they told him that his wife was going to divorce him and cause him trouble over his land, and that if he would deed the land to them they would hold it and preserve it and keep her from getting any of it. He considered the land valuable and wanted them to have it after he was through with it. He did not want the daughter in Drumright to have any of it for the reason that she had an allotment of her own. His third wife had overdrawn his account at the bank and had run him in debt to merchants. At the request of the four children, he executed the deed in favor of them as grantees; and for a consideration of $50 and services rendered, he deeded to O. T. Hubbell an undivided one-fourth interest in the royalty under the 70-acre tract of land. Hubbell deeded it to Jonathan A. Smith, and he, in turn, deeded it to Floyd G. Hubbell. Plaintiff then went from Cushing back to where his wife lived. Soon thereafter she sued him for divorce. He told her and her lawyer that he had deeded the property to the four children before he married her. His wife was granted a divorce and given $500 in settlement of her claim for alimony. Soon thereafter the four children leased a portion of the land for oil. From the proceeds they paid off the mortgage against the land, paid up the taxes, made improvements on the land, repaired the fences, and paid for living expenses for themselves and their father, who lived with them from the time of separation from his last wife.

Prior to the execution of the deed, plaintiff made a will giving all of his property to the four children and excluded the daughter at Drumright for the reason that she had an allotment of land. After execution of the lease, an oil well was commenced on an adjacent tract of land and soon thereafter the Drumright daughter went to see plaintiff to find out why she had been left out of his will. She took him to Drumright, and, after she and a lawyer had talked to him, he made a new will and gave the property to all of the children and authorized the lawyer to bring this suit. He then went home, where he continued to live with the four children.

On trial of the case to the court, it sustained a demurrer to the evidence of plain-

tiff and entered judgment against him. This action of the trial court is brought here for review.

Under the record disclosed herein, it becomes necessary to determine what weight and credit shall be given the judgment of the trial court in an equity case of this character. In the case of Penny v. Vose, 108 Okla. 103, 234 P. 601, this court said:

"Where this practice is followed in an equity case, however, the court should treat the demurrer to the testimony as a motion for judgment in favor of defendant upon the testimony as produced by the plaintiff. Such a motion and such a consideration of a demurrer to the testimony would naturally and properly require a weighing of all the testimony introduced by the plaintiff by the judge trying the case. Any other rule would result in an absurdity. When the plaintiff has introduced all his testimony and rested, if upon consideration of all such testimony, the court, trying the case without a jury, is of the opinion that the defendant should prevail, it would be an idle thing to require the defendant to put on testimony to bolster up a case he had already won. When the plaintiff has exhausted his testimony and so announces by closing his case, it is not error for the court to weigh plaintiff's evidence and pronounce judgment for defendant where the testimony warrants."

Not only is the above rule a correct one, in our judgment, the record in this case affirmatively discloses that the trial court, after it weighed all of the evidence, entered its judgment thereon. Among other things, it said:

"I think the plaintiff knew exactly what he was doing when he did it, and for a purpose, and the purpose has been carried out, and I doubt very seriously if he could, in equity, cancel this conveyance any way; not with the reasons he gives for transferring the property."

The court, in its journal entry, in part, said:

"Now, on this 3rd day of April, 1928, the above-entitled action comes on regularly for trial, plaintiff being present in person and by his attorneys of record, Streeter Speakman and H. M. Jarrett, and the defendants appearing in person and by their attorneys, Andrews & Andrews. Thereupon both parties having announced ready for trial, witnesses having been sworn, plaintiff introduces his evidence and rests; thereupon the defendants and each of them severally interpose their demurrer to the evidence offered by the plaintiff herein and thereupon the court sustains said demurrers, to which the plaintiff duly excepts, and thereupon the court finds that the plaintiff's petition should be dismissed and that judgment should be rendered against the plaintiff herein for costs, to all of which the plaintiff excepts.

"It is, therefore, considered, ordered, and adjudged that the demurrers interposed by the defendants to the evidence of the plaintiff offered herein be and are each hereby sustained, and that the plaintiff's petition is hereby dismissed and judgment is hereby rendered in favor of the defendants and against the plaintiff for the costs of this action, to all of which the plaintiff duly excepts."

These proceedings clearly show that the trial court considered and weighed the evidence and rendered judgment thereon, and its judgment in so doing should be affirmed, unless it is shown that the same is against the clear weight of the evidence. The only witness who testified in the case was the plaintiff. His testimony, in some instances, may have been somewhat in conflict. If it were, the trial court could—as, from the judgment entered, it evidently did—believe that portion of his evidence which was strongest against him. His evidence, in part, was as follows:

"Q. Now, Mr. Connelly, how old was Esther, the woman you married? A. I believe she said she was 23 years old. Q. Was she living down there by the Agency in a house? A. She had been living there. * * * Q. After you married Esther you moved up into the house where she was living and stayed with her? A. Yes, sir. * * * Q. When you married her, you were living in your house in the town of Sac and Fox Agency? A. Yes, sir. * * * Q. You rented out the land that you owned? A. Yes; I rented my land, part of the time, and part of the time all of us farmed it. Q. You and the two girls lived there in a house in town? A. One of them at a time. Q. One at a time? A. Yes, sir. Q. The girls stayed there and took care of you and did the house work? A. Yes, sir. Q. And looked after affairs, and you are a member of the Sac and Fox business committee. A. I have been. Q. How long were you a member of that committee? A. I have been there a good while. Q. This woman—you married this woman? A. Yes, sir. Q. She peddled whisky up there? A. Right close to Fay. Q. You went up to her place? A. She told me herself she peddled whisky for a living at Wewoka and different places, and Stroud. She told me that herself. Q. Now, after you married this woman, you say your children didn't like it? A. Yes. They didn't want me to have her. Q. You had four children, two boys and two girls? A. Yes, sir. Q. You had a fifth child that lived at Drumright? A. Yes, sir. Q. That girl that lived at Drumright got a Sac and Fox allotment, didn't she? A. My daughter by my first woman. Q. Your daughter at Drumright by your first wife was receiving a Sac & Fox al-

lotment? Is that right? A. She had an allotment; yes, sir. Q. Now, these four children, the younger children, they didn't receive any allotment? A. They didn't have no allotment. The land was all gone. Q. You never sold any land, did you? A. No, sir,—well, I did, my wife's. Q. You sold your wife's land and you bought this other land with that money? A. Well, I was in a hole and I got in debt and funeral expenses and she had been sick all the time with rheumatism, my first (sic) wife, the mother of these children. I sent her to springs, a spring over here, and went in the Cherokee Nation. She had rheumatism, and I was in the hole and I had to sell that land. Q. You sold the land to pay your debts? A. Yes, sir. Q. That is the only land you sold? A. Yes, sir. Q. Now, after your last wife died you talked to your children about this property, didn't you? A. Well, we owned it. They were at home together. Q. You told your children, those four—A. Yes, sir. Q. —You wanted them to have your land when you were dead? A. After my death; yes. Q. And you made a will? A. I made a will. Q. Giving all this property you owned to your four children? A. Yes, sir. Q. After you made this deed to the four children, you went up to Drumright? Your daughter from Drumright came down and got you? A. Yes, sir. Q. And took you to Drumright? A. Yes, sir. Q. She talked to you, didn't she? A. Wanted to know what I cut them out for. Q. Wanted to know why you cut her out and gave all the property to the four children, didn't she, and she took you to Mr. Speakman, to Sapulpa, to start this lawsuit, didn't she? A. Yes. You never had any idea of starting this lawsuit until your daughter at Drumright got you to do it, did you? A. No. Q. The first time you ever had any idea of saying you were dissatisfied with this deed was after you had talked to your daughter at Drumright and she had told you she wasn't satisfied and she thought she ought to have part of the property? A. Well, I wasn't satisfied. If they had let me alone I believe I could have got out without any expense with this woman, but they scared me. Q. After you talked with your daughter at Drumright, you made another will, didn't you? A. Yes; made another will. Q. And gave her part of the property? A. Yes, sir. Q. You did that after you made the deed to these four children? A. After; yes, sir. Q. Now, you told the children just recently, told these four children, as soon as this lawsuit was settled you would make a new will and give it all to these four children? A. Yes, sir. Q. You don't want this girl at Drumright to have any of this property? A. I think the last will had six children. Q. You want the property to go to the four children, and that is what you wanted that day in Cushing when you made this deed, wasn't it? A. I have got to understand you before I answer. Q. You had two boys

that lived at Cushing? A. Yes, sir. Q. And two girls lived down there with you? A. Yes, sir. Q. They went over to your house where you were living with this woman Esther and they took you to Cushing? A. Yes. Q. When you got to Cushing all four of the children were there, the two girls and two boys? A. Yes, sir. Q. And they told you this woman, you had married was going to sue you for divorce and try to get your property and that the way for you to prevent her from doing that would be to deed the property to them, wasn't it? A. Yes. Q. And you said, 'All right; I will do that.' Is that right? A. They was to give it back to me after it was over and me go ahead and do my business like I always had been. Q. So you now say the agreement was you should deed it to the children until you got rid of Esther and when you got rid of Esther they were to deed it back to you? A. Yes, sir. Q. That was the understanding had, and was your understanding? A. Yes, sir. Q. Your purpose in deeding it to the children was to keep Esther from getting it? A. Yes. Q. Now, Esther did sue you for divorce, didn't she? A. I guess she did. I came here to the court. Q. You went down to the bank and borrowed the money? A. Yes, sir. Q. And paid Esther off? A. Yes, sir. Q. And you settled with Esther because Esther thought you didn't have any real estate, didn't she? A. Yes, sir. Q. You told her you had sold the real estate and given it to your children, didn't you? You told her you did that before you married her? A. Yes. Q. And after she found out that you did convey the property to the children before you married her, then she settled with you for money? A. Yes. Q. You still owe Mr. ——————— down here that money? Have you ever paid it? Have you paid the Union National Bank yet? A. Yes. Q. Where did you get the money to pay that? A. What was it for? Q. The money you borrowed from the bank to give to Esther, where did you get the money to pay that back? A. I got it from Brown. Q. Did you pay Brown? A. Yes, sir. Q. Where did you get the money to pay Brown? A. From a piece of land not restricted that came through the Indian office, my share of it, and went to my other children, their share of it, the way the government divided the money. Q. Now, after the deed was made and recorded, the children sold a lease on the land, didn't they? A. Yes. Q. And they took the money they got and paid off the mortgage on the property? A. Yes. Q. And they told you they would do that? A. Yes, sir. They didn't say they would do it. That they was going to give it to me and let me do it, and afterwards they said they did pay it. Q. They did pay it off, didn't they? A. I guess they did. Q. That was $900 and interest? A. Yes, sir. Q. They fixed up the house, didn't they, on the property? A. Out of that money, I guess. Q. They paid up all the taxes? A. Well,

they claimed they did. Q. They paid what you owed the First National Bank of Stroud, didn't they? A. I don't think I owed anything at that time. Q. Your wife Esther had written checks on that bank and you had an overdraft there? A. I don't think I owed any there, because I had a little money there too. Q. Your wife Esther checked that out and left an overdraft? A. Yes, sir. Q. They took up that overdraft? A. Yes, sir. Q. Your wife Esther bought goods all over town, several hundred dollars worth, and they paid up those bills? A. Yes. As long as I was with her I had to pay the grocery bills and my family—I had to get a divorce. Q. You had to get a divorce from Esther to keep her from spending all your money? A. She got the divorce. She asked for the divorce. Q. How much money did she run you in debt there in Stroud in the little while she lived with you? A. It amounted to pretty near $100 (sic), with the $500 and the grocery account. Q. You paid that all off? A. Yes, sir. Q. You paid it out of the proceeds of this oil lease, didn't you? A. Yes, sir. Q. These children are not trying to sell this land, are they? A. I understood they divided the money. Q. You have never heard of them trying to sell any of this land, have you? A. I don't understand. Q. Well, never mind. After you started this case, after you employed Mr. Speakman and started this lawsuit, you went back down to the Agency? A. Yes, sir. Q. You have been living there with the children ever since? A. Part of the time, and part of the time I would go around. Q. Go around and visit the different children? A. Yes, sir. Q. A day or two ago your daughter at Drumright came down and got you and took you up to Drumright? A. Yes, sir. Q. And brought you down here today to this trial? A. The one at Drumright; yes. Q. And just prior to that time you were staying there at the Agency with these children? A. I always lived there and I stayed there all the time—most of the time Q. They looked after your property and cooked your food? A. Yes, sir; and cropped it and fenced it. Q. Looked after the fences and did the work? A. Yes, sir. Q. You want them to have the property when you are through with it? A. Yes, sir. Q. That is, these four children. Now, these other children by your former wives, you don't want them to have any of it at all? A. Well, that is how I came to cut them off, because they had an allotment. Q. Your purpose in giving this property to these children was because these children never received any allotment? A. In case I was to die they was to get it. Q. That is your understanding of it now? A. Yes, sir. Q. They leased that land for all it was worth, didn't they? A. Yes, they leased the land. Q. The company is paying the rentals? A. Yes, sir. Q. They are using the rentals of the land to keep up the house? A. Keep up the house? Q. Keep you and pay the grocery bill, etc., aren't they? A. The bills —I don't have no way of keeping—I did have stock there. I just couldn't keep it and haven't got any chickens and no pigs and don't have no way to keep them with. Q. You don't want to sell this land? A. No. Q. You think it is valuable land? A. Or I would have sold it long ago. If it was mine I could have mortgaged it, which I did one time—that is what I was going to pay Gum Brothers. Q. You want the property to go to these four children when you are through with it? A. Yes."

This testimony clearly shows that, after he is through with the land, he wants the four children to whom the land was deeded to have it. He does not want the daughter at Drumright to have any of it for the reason that she had an allotment, while the four children did not. It shows that plaintiff had made a will, before he went with his daughter to Drumright, in which he willed all of the property to the four children who were the grantees in the deed; that, thereafter, the Drumright daughter came and took him to Drumright, and, he testified, he never had any idea of starting this lawsuit until she got him to do it. She also got him to execute a new will in which she was included as one of the beneficiaries, but even then, on the trial of the case, he testified he did not want her to have any of the land for the reason that she had an allotment of her own, and that it was his intention to make a new will and give all of the property to the four children who were the grantees in the deed. after he was through with it. This shows a clear desire on his part for the four children, who were the grantees in the deed, to have all of the land after his death.

He further testified that the four children told him that Esther, his third wife, was going to sue him for a divorce and try to get his property and that the way for him to prevent her from doing so would be to deed the property to them until he got rid of her and they were then to deed it back to him; and that the purpose in deeding it to the children was to keep her from getting it; that she did sue him for a divorce and he settled with her for $500 because she thought he did not have any real estate. He told her he had sold the land to the children before he married her, and after she found out that he had conveyed the property to the children before she married him, she settled with him.

This testimony shows that the substance of what the children said to him was true; that is, that Esther was going to sue him for divorce and try to get his property. It was on this representation that the deed

was made in favor of the children as grantees, and the record discloses that the deed was dated before his marriage to Esther, although it was executed after he married her. He represented to her that it had been executed and delivered before he married her, and that he did not own any land at all. On this representation, which she evidently believed, the settlement of alimony was made for the sum of $500. In other words, he deeded the land to the four children for the purpose of defrauding his wife.

The cases cited by plaintiff in error, in our opinion, do not disclose facts like those disclosed by this record. In substance, this record shows that the husband deeded the land to the four children for the purpose of defrauding his wife in her suit for alimony, and after the suit was over, the husband brought this suit, at the suggestion of the Drumright daughter, to cancel the deed in favor of the children. Under the facts disclosed by this record, the trial court, as a court of equity, committed no error in leaving the parties where it found them.

After hearing all the evidence and the argument of counsel, the trial court entered judgment against plaintiff. Since we cannot say its judgment in so doing is against the clear weight of the evidence, it is accordingly affirmed.

LESTER, C. J., CLARK, V. C. J., and CULLISON and KORNEGAY, JJ., concur. RILEY and SWINDALL, JJ., dissent. ANDREWS, J., absent and disqualified. McNEILL, J., absent.

---

SWINDALL, J. (dissenting). I cannot agree with the majority opinion. I have no fault to find with the syllabus in the majority opinion, but do not feel that the same covers the issues presented by the pleadings and disclosed by the evidence in the case. As stated in the majority opinion, Alexander Connelly was a Sac & Fox Indian past 80 years of age, and the defendants Grace Gaffaney, Charles T. Connelly, Edgar Connelly, and Theresa Alvira Connelly are children of plaintiff by his second marriage. Floyd G. Hubbell was the notary public acknowledging the deed of Alexander Connelly involved in this action. O. T. Hubbell is a brother of Floyd G. Hubbell, and Jonathan A. Smith appears to be a "go-between" of the two Hubbells. The Gypsy Oil Company is the owner of an oil and gas lease executed by the owners of the record title of the real estate at the time the same was executed. A demurrer was sustained as to the Gypsy Oil Company

and no objection was made as to the ruling of the court sustaining the demurrer, so it is not before this court. Alexander Connelly was the owner in fee simple of all the real estate described in the pleadings.

About the 1st day of March, 1926, he married a third wife, who was alleged to be about 23 years of age. Shortly after this marriage his children by a former marriage, the defendants in this case, stated to him that this woman married him for his property and was going to sue him for divorce and alimony and get all of his land.

It is the contention of the plaintiff, in substance, that owing to the fiduciary relation existing between the plaintiff and defendants such relationship implies a condition of superiority held by one of the parties over the other, in this instance by the children of the second marriage over the father; and that in every transaction between them by which the superior party obtains a possible benefit equity raises a presumption against its validity, and to overcome the presumption the burden is cast upon the party receiving the benefit of proving affirmatively their compliance with equitable requisites; and that due to such fiduciary relation the defendants exerted undue influence over the plaintiff and thereby induced him to convey all of his property to them with the agreement and understanding that they were to reconvey the property to plaintiff after his third wife had secured a divorce, and that they practiced a fraud upon him by inducing him to convey his property to them by reason of such fraud and deceit practiced upon him, in that they agreed to reconvey the land to him when he and his third wife had settled their property rights or their property rights had been settled by the court, and that they refused to reconvey the property to him according to their agreement. The four children in their answer admitted that the plaintiff conveyed the real estate involved in this action to them in trust to hold during the lifetime of the plaintiff, and that they were to give the plaintiff all of the agricultural rents therefrom during his lifetime, and pursuant thereto the transfer was made by the plaintiff to these defendants, and these defendants have ever since held the said property and have ever since given this plaintiff all of the agricultural rents therefrom, and have at all times and in all things complied with their agreement and are now willing, ready, and able to comply therewith, and that it was then and there agreed and understood that all of the oil rentals and bonuses should be used by these defendants for their support and maintenance and for the purpose

of paying the taxes against the land and the indebtedness existing against the land. The children defendants further allege in their answer that they admit that after the marriage of the plaintiff with the said Esther Ballard these defendants were informed and believed that the said Esther Ballard married this plaintiff only for the purpose of obtaining from him a part of his property, and that in order to protect their father and his property and in order to protect themselves in their inheritable interest in the property of their father they informed their father of their information and belief and requested him to convey the property to them for the purpose of defeating the intentions of his wife, and he told them that he did not want this woman to have any of his property, and that he wanted the property to go to these defendants, and he thereupon conveyed the property to these defendants of his own free will and accord and for the purpose of perfecting the title of said property in these defendants and for the purpose of keeping his wife, the said Esther Ballard, from procuring any part thereof. They admit that thereafter the said Esther Ballard sued the plaintiff for divorce and asked for a division of the property, and that plaintiff then contended that he owned no property, and that he had conveyed the property to his children prior to his marriage to the said Esther Ballard, and by reason thereof succeeded in settling with the said Esther Ballard for the sum of $500. That by reason thereof the plaintiff is estopped to now assert title to this property in him.

The pleadings constitute the issues before the court. As stated in Miller v. Gregory, 132 Okla. 48, 269 P. 302:

"The pleadings in a civil case are not merely matters of form, but they are solemn declarations of the parties. They present to the court what the pleader claims the facts to be and upon such statement asks it to grant him relief, and he is bound by every statement against his interests made therein, and will not be heard to question the correctness thereof, so long as they remain a part of the record; and they may be taken advantage of by the adverse party at any stage of the case, either in the trial court or on appeal, if they are preserved in the transcript or case-made." (Citing Bank of Buchanan County v. Priestly, 87 Okla. 62, 209 P. 412; Lee v. Little, 81 Okla. 168, 197 P. 449; Brown v. Hartford Fire Ins. Co., 108 Okla. 90, 234 P. 352.)

So, in this case, where the deed shows upon its face to be an absolute conveyance in fee simple of this property by the plaintiff to four of his children and in his pleadings he contends that the property was conveyed under certain circumstances, and the children answer and admit that the conveyance was not an absolute conveyance in fee simple of the title and allege that the same was conveyed in trust, and that the plaintiff was to receive the agricultural rents and that they were to receive the oil and gas lease rental bonus money and one-eighth of all oil and gas produced under the oil and gas lease, in my opinion it was the duty of the court to determine from the pleadings and the evidence whether the plaintiff's theory or the defendants' theory of the case was correct, and if a trust agreement of the character pleaded by the defendants was valid and enforceable, and settle the rights of the parties in accordance with the facts as pleaded and the evidence offered in support thereof. The demurrer of the defendants, treated as a motion for a judgment in favor of defendants upon the testimony offered by the plaintiff, searched the record and called the attention of the court to the fact that the deed was not an absolute conveyance in fee simple, but was in fact a conveyance of the real estate as claimed by the plaintiff or as claimed by the defendants, and therefore the motion should have been denied, and if the defendants desired to offer proof in support of their theory of the case as framed by the pleadings, they should have been permitted to do so, and all of the issues presented by the pleadings and the evidence determined by the court.

The facts are set forth in the testimony of the plaintiff. The majority opinion contains the greater portion of the cross-examination and is based upon the cross-examination of plaintiff; however, I am of the opinion that a better understanding relative to his condition of mind, the reasonableness of the story told by him, and the correct conclusion to be reached relative to the issues in the case, that is, whether or not undue influence was exerted over and fraud and deceit practiced upon him by the defendants as contended by plaintiff, or that the trust agreement is as claimed by defendants and was fairly and honestly made as alleged by them in their answer, is disclosed by his direct testimony. So, I am setting forth herein the questions propounded to him and the answers returned, as follows:

"Direct examination.

"By Mr. Speakman: Q. State your name. A. Alex Connelly. * * * Q. Do you remember, Alex, about making a deed to four of your children? A. Yes, sir. Q. What four of your children were named in that deed? A. Well, there was Charley Connelly and Edgar Connelly, boys, and Grace—I don't know

whether Connelly or not—she is married—Gaffaney—there is only three of my children. Q. Where were you when you signed that deed, Alex? A. When they came after me? Q. Start in at the time they came after you and tell the court what happened that day. A. Well, I was living in an old building that used to belong to John Harler, north of the Agency about a quarter, may be, there—Q. All right. Were you married at that time? A. Yes, sir. Q. Who were you married to? A. I married a woman, I think her name—Esther was her first name. Q. How long had you been married at that time? A. About three weeks. Something like that. Q. Who was it came after you? A. Grace Gaffaney and Edgar Connelly; my boy and girl. Q. Tell the court just what they said and did. A. They said they wanted to see me up at the house where I had been staying, you know, and they would bring me back, and this woman I was living with she said she wanted to go along. I said, 'I am coming right back.' Well, I got in the car with them and instead of going to the house they went west, coming this way and I didn't know where they were taking me, and this other man, Gaffaney, he jumped in the car and stood on the steps there and goes with us. Q. Where were you at this time? What direction from Stroud and how far from Stroud were you living? How far south of Stroud was it, Alex, you lived then? A. It was north from where I was living. Q. Of Stroud? You didn't live north of Stroud? Stroud was north from where you lived? A. Yes, sir. Q. How far north was Stroud from where you lived? A. I think they call it six miles. Q. Straight north? A. On that section line. Q. What kind of a car were they driving in? A. They was driving—Q. An automobile? A. Yes, sir. Q. Where did they take you to? A. Well, they took me—kept going two miles east and then north and then right by where that big stone is in the Chandler road—that big road. Q. That goes from Chandler to Stroud? A. Yes, sir. Then Gaffaney jumped off there and I didn't ask him—we went on towards Davenport. Q. Did you know where they were taking you to? A. No, sir. I thought they were taking me to Chandler. I didn't know where they were taking me. Q. What did you do? A. After we got to where the road went to Kendrick they took me towards Kendrick and I began to think they were taking me into Cushing and they went on to Cushing. Q. They did go right to Cushing? A. Yes, sir. Q. What did they do with you after they got up to Cushing? A. They got up and this Gaffaney come with Mr. Hubbell, together, and they all went down to town and got a room to do business. making up these papers. Q. All right. A. We went up in a room—one room we couldn't get and went on to another place and got a room there. Q. Who saw to getting the room? A. Mr. Hubbell. Q. What took place when you got into the room?

What happened? A. They told me then they wanted me to give them a deed. Said if I didn't do that this woman will get all the land and they wouldn't have any and I wouldn't have any. She would get all the land. They said, 'She is marrying you for the land,' and it scared me. is all. I didn't want to sign for a long time, and I pretty near backed out, but they scared me that way any how. Q. Scared you because they said the woman would get all the land? A. Yes. Q. Who wrote out these deeds? A. Mr. Hubbell. Q. Did you see them before they handed them to you to sign? Did you know what they put in them? A. The boys was there. They asked us to read it over, but I couldn't tell anything about the business later. I didn't understand it. Q. All right. Go ahead and tell what else was said and done? A. Well, they said they would give me these lands back and do my business like I always had done, go and pay these taxes and grocery bill, and I owed Gum Brothers $900, which I aimed to pay if I got this money, and instead of doing that they done it. They made the deal and I didn't make any deal at all. I don't know when it was done. The oil men kept coming there and they kept pushing me off. That wasn't what they were talking about; sitting around on the porch and trying to hide away from me. They didn't want me around there. Q. Was that when the oil men came? A. They said they were talking on another matter—My wife's allotment I sold and they were trying to get that back. That is what they told me. Q. What did you find out they were really doing? What did they really do? A. I couldn't find out nothing. I don't know what they were doing. I just thought they might be doing that. Q. What did they do to your land? Did they make an oil and gas lease on it? A. Made an oil and gas lease. Q. How much did they get? A. Forty dollars an acre. Q. They didn't give you anything out of it? A. No, sir. Q. They did pay off the Gum Brothers' note? A. Yes, sir. They did pay that, and I think they paid the taxes. Q. How much did you owe on this Gum Brothers' note? A. Nine hundred dollars, if I ain't mistaken. Maybe a little over. Q. What did they do with the rest of that money? A. They kept saying they would give me some, but they never done it, and I kept still and didn't bother and I thought may be they would give it to me and they never gave it to me. and I came to Cushing one time—I believe after I had seen you—if I would go down to the Agency they would give me this money, the balance of the money. It was in court now and I couldn't do it and I didn't take it. Q. Was anything done out there about claiming they lost it? Tell the court what claims they made about losing the money. A. Yes; I was up there at home—this Bartley, Bert Bartley—Q. Who is he? Did he go with one of your girls? A. He was staying there, and then

he was sleeping upstairs and I was downstairs and I heard a gun along about two or three o'clock, a pistol, and I went outdoors and he said, 'Somebody has been here; did you have money here?' They said they had it buried there. Q. Who said that? A. Bert Bartley. Q. Who said they had it buried there? A. They both said that. Q. Who was both of them? A. I tell you who had it in their hands when I get through. I told them to stand there and see if I could track them. There was dew on there that morning. I never tracked anybody there, but they run down after they seen him down there and after I got back after trying to find the track they was shaking the money—they had part of it, $500, they said —five $100 in each package and had a little can and they got the other one. Q. That is what they told you? A. That is what they told me. Q. You say you went around the house and looked for tracks? A. Yes, sir. Q. You couldn't find any? A. I didn't see any. If there had been anybody there I didn't see any tracks there. Q. Well, how old are these three children you deeded this land to? Are they of age? A. Yes, sir. Q. Are they grown? A. Yes, sir. Q. Where have they lived all their life? A. They have been living with me, staying there at home. part of the time, and part of the time they would go off, but they make their home there. Q. Have you educated your children? A. Yes, sir. Q. What have you done in reference to educating them, these three children? Have you sent them off to school? A. Yes, sir; Haskell government school, and while they were small sent them to school at the Home. They used to have a school there. Q. Are they well educated? A. I think so. Q. Have you gone to school very much? A. Not much. I went to school up in Kansas when I was a boy, where I was born, but I never went to school much, and I ain't got no education. Q. Can you read and write? A. I can read and write. * * * Q. Have these boys and girls been living with you since you made this deed there on the place? A. Yes. Q. Theresa is at Claremore? A. She was staying there awhile. When this money was lost she phoned to this other girl—she was living at Cushing—Grace Gaffaney—they was staying up at Cushing. She went after her, you know, and she stayed with me there, Grace did, and she went off after this had happened, that money was lost, claimed somebody had robbed them. Q. At the time you made this deed your wife didn't sign it, did she? A. No. Q. Were you claiming any of this land as your homestead at this time? A. Yes. * * * Q. What had you planned about living on any of this land? Just tell the court what arrangements. A. Well, there was a house there I had bought. It was vacant—a building there, and I aimed to move up there and I took this woman up to the house once and they got to quarreling and I got to studying then and I seen my children didn't want me to marry this

woman. Q. At the time you made this deed —signed this deed—had you and your wife had any quarrels? A. No, sir. Q. Were you getting along all right at that time? A. Yes, sir. Q. How many acres of land did you own at that time, altogether. A. Well, the piece the government gave me. 160 acres —Q. That was your allotment? A. Yes, sir. Q. What other land did you own? A. I bought from the firm, they call it, 70 acres. Q. Did that join up against your 160 acres? A. Yes, sir. Q. Where was the house you made plans to move into? Was it on the 70 acres or 160? A. On the 70. Q. Could you have moved onto your allotment at the time you were married, or was there somebody else in the house? A. Somebody else was in the house? Q. Who was it? A. My renters. Q. Have you always lived there on your allotment? A. Yes, sir. That was my own place. That is where these children were all born. Q. How many years have you lived there and made that your home? A. After the treaty was made. Mr. Speakman: Take the witness."

After hearing this testimony and applying the same to the issues framed by the pleadings, the trial court sustained a demurrer to the evidence of the plaintiff, treating the demurrer as a motion for a judgment in favor of defendants upon the testimony offered by the plaintiff. The plaintiff has appealed, and the majority opinion holds that the trial court was justified in sustaining the motion. The majority opinion stresses the fact that the plaintiff had been selected as a member of the business committee of the Sac & Fox Indian Tribe, and had served quite a long time as such, and that he was one of the three men who had charge of the business affairs of that tribe. I cannot see where this fact sheds much light upon the issues involved in this case. It is a matter of common knowledge that the Sac & Fox Indian Tribe have not had much business to transact in the state of Oklahoma for several years and they never had very much business to transact without the superintending control of the federal government. Further, he might have possessed some knowledge as to how the business committee of the Sac & Fox Indian Tribe might have settled the property rights between him and his third wife, but this in no way detracts from his testimony to the effect that when his children told him that his wife would sue him for divorce and get his property it scared him, for there is no testimony that he had any knowledge concerning how a court of justice might settle the property rights of him and his wife in a divorce and alimony action. We must view the testimony as we find it in the record. We have an uneducated Sac & Fox Indian past 80 years of age entering into a solemn bond of matri-

mony with a young woman 23 years of age, who he admits advised him that she had unlawfully sold intoxicating liquors at different places; who in testifying in answer to a question to name his four children, testified: "Well, there was Charley Connelly and Edgar Connelly, boys, and Grace I don't know, whether Connelly or not—she is married—Gaffaney—there is only three of my children." The deed involved in this action shows four children named as grantees, the pleadings name four and the majority opinion recites that there were four. The father seems to remember only three. He is not certain as to the name of his third wife. He testified: "I married a woman, I think her name—Esther was her first name." Son-in-law Gaffaney knew just when and where to leave the car in which the plaintiff was being transported and to appear at the opportune time and place with a friendly notary public to ante-date the deed and describe the plaintiff as a single man and arrange for a room where the plaintiff and his four children might have a quiet and secluded spot to transact this business and incidentally execute a mineral deed to a brother of the notary public, and later the mineral grant passed to the notary public. Do these facts disclose that the plaintiff was a man of strong will and powerful mentality at the time this deed was executed? Further, the record shows that he received an allotment from the government of the United States, and that during the 80 years of his life he had only acquired or accumulated title to 70 acres more. According to Shakespeare, King Lear was a man possessed of great wealth, a brilliant mind, strong determination, still in his declining years one of his daughters by portraying a great love and ardent devotion for her father induced him to convey all of his property to her, promising to love and cherish him and be a loving and dutiful daughter and provide him a home so long as he might live, but upon receiving his property, the story goes, the father was turned out homeless and penniless. We do not have to look to the writings of Shakespeare for examples of this kind, because they appear in everyday life and are known to every member of this court. Still, when the old Sac & Fox Indian reaches out his hand and raises his voice to a court of justice to protect him in his property that he may have a home during his declining years and then dispose of his property as his mind and conscience may dictate, the trial court refused him relief and this court affirms that judgment. I cannot concur in the opinion, as I feel that the same is contrary to the facts disclosed by the record. The evidence shows that this old Sac & Fox

Indian was approached by his daughter, Grace Gaffaney, and his son, Edgar Connelly. They said they wanted to see him up at the house where he had been staying, and that they would bring him back, and his wife said she wanted to go along and he said, "I am coming right back," showing that he did not know that he was going further than the house where he had been staying. They got him in a car with them and instead of going to the house they went westward. He did not know where they were taking him. His son-in-law, Gaffaney, jumped on the car and stood on the step and went with them a part of the way, then Gaffaney jumped off of the step of the car and went towards Davenport. He thought they were taking him to Chandler. They passed the road leading to Kendrick and the plaintiff then decided that they were taking him to Cushing. When they got to Cushing, Gaffaney came up with the notary public, Mr. Hubbell. Mr. Hubbell saw to getting the room and prepared the papers. The record shows that the notary ante-dated the papers to a time prior to the time that the plaintiff married Esther Ballard, and described the plaintiff in the deed as a single man. He prepared a mineral deed for an undivided 14th interest in 70 acres of the land to his brother and his brother later conveyed the land to Smith and Smith in turn conveyed the land to the notary, Floyd G. Hubbell. The record shows conclusively that the plaintiff had no time for reflection, no opportunity to consult with a disinterested party, and no opportunity to advise with an attorney of his own choosing. In the case of Hogan et al. v. Leeper, 37 Okla. 655, 133 P. 190, in sustaining an action of the trial court in canceling a deed of trust alleged to have been executed under duress, referring to the father who executed the deed, the court says:

"He had no opportunity to reflect and had no opportunity to consult a lawyer of his own choosing. The fact that he had no opportunity for reflection and advice is a strong circumstance in the case." (Citing authorities)

And then quotes from McClure v. Lewis, 72 Mo. 314, as follows:

"Whenever there exists between parties confidence on the one hand and influence on the other, from whatever cause they may spring, equity requires in all dealings between them the highest degree of good faith on the part of him in whom the confidence is reposed. If a conveyance is executed by the other in his favor, the burden rests upon him to prove that it was not procured by means of such confidence and influence. It is his duty, before accepting the convey-

ance, to see that the grantor has disinterested advice and full information."

The Supreme Court of Michigan in Re Disbrow's Estate, 58 Mich. 96, 24 N. W. 624, says:

"Influence obtained by flattery, importunity, superiority of will, mind, or character, or by what art soever that human thought, ingenuity, or cunning may employ, which would give dominion over the will of the testator to such an extent as to destroy the free agency, or constrain him to do against his will what he is unable to refuse, is such an influence as the law condemns as undue, when exercised by any one immediately over the testamentary act, whether by direction or indirection."

This court in Harjo et al. v. C. P. J. Collins et al., 146 Okla. 131, 293 P. 179, 72 A. L. R. 1034, held that:

"Where a fiduciary relationship exists, such relationship implies a condition of superiority held by one of the parties over the other in every transaction between them by which the superior party obtains a possible benefit, and equity raises a presumption against its validity, and, to overcome the presumption, casts upon the party the burden of proving affirmatively his compliance with equitable requisites. * * *"

In the case at bar the undisputed evidence shows that a short time after this land was conveyed by the plaintiff to four of his children the same was leased to the Gypsy Oil Company for a bonus of $40 per acre. This, the children contended under the agreement at the time the land was conveyed to them, was for their support and maintenance, evidently a benefit, and being a benefit the burden was cast upon them under the holding of this court to show that the conveyance was in good faith. So, I am of the opinion that they did not meet this requirement, and that the trial court was in error in sustaining the demurrer of the defendants in the nature of a motion for judgment in their favor.

In Ruling Case Law, vol. 10, page 898, it is said:

"* * * Where no fiduciary relation exists between the parties to a transaction, or where one party thereto has no advantage over the other, the burden of proving fraud is on him who alleges it. But where a fiduciary relation exists between the parties to a transaction, the burden of proof of its fairness is upon the beneficiary."

Again, in 12 Ruling Case Law 427, it is said:

"But when proof has been given as to the surrounding circumstances by the party alleging fraud, and these circumstances are such as to raise an inference of fraud and make out a prima facie case, the burden of proof shifts, and the onus of showing that there was no fraud is on the other party. So, if the parties stand in a relation of trust and confidence, and the party in whom the confidence is reposed obtains an apparent advantage over the other in a transaction between them, such transaction is presumed to be void, and the burden of proof is upon the party who seeks to support it to show by the clear proof that he has taken no advantage of his influence or knowledge, and that the arrangement is fair and conscientious."

Do the facts and circumstances in this case show that the procuring of this deed on the part of the children and the notary public was fair and conscientious? I think not. The rule is laid down in 27 C. J. 47, as follows:

"Where the parties to the alleged fraudulent transaction do not deal upon an equal footing, as where a fiduciary reationship exists, or where one of the parties possesses power or influence over the other, or one is of weak mind and the party occupying the superior position has obtained a substantial advantage over the other, the burden of proof is upon such party to establish the fitness and honesty of the transaction."

Again, in 21 C. J. 113, we find this language:

"Equity will often deem fraudulent, because of the relations existing between the parties, conduct which would not be objectionable in the absence of such relations. This principle has been applied to dealings between attorney and client; guardian and ward; parent and child; principal and agent; trustee and cestui que trust; to executors and administrators; brokers, as to matters within the scope of their agency: directors of a corporation; partners; and promoters. The relation which calls this rule into operation is not necessarily some technical relation created by, or defined in law, but any actual reposing of confidence, however created or originating, where the other essentials to the exercise of jurisdiction are found."

In Clinton v. Miller, 77 Okla. 173, 186 P. 933, this court used the following language:

"The authorities uniformly hold that in all transactions between persons occupying fiduciary and confidential relations to each other, in which the stronger or superior party obtains advantage over the other, they should not be upheld, and that in actions involving validity of such transactions, the burden of proof is cast on the superior party to establish the perfect fairness of the transaction and that the consideration was adequate."

Was the father or the children the superior party in the transaction involved in this case? The testimony shows that the father

had educated the children and that they were in the prime of life, active and alert, and that the father was past 80 years of age, without education, and I feel that the record shows that he was easily influenced.

"While equity does not deny the possibility of valid transactions between parties where a fiduciary relationship exists, yet because every such relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption. The broad principle on which the court acts in cases of this description is that wherever there exists such a confidence, of whatever character that confidence may be, as enables the person in which confidence or trust is reposed to exert influence over the person trusting him, the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a contract with the person so trusting him." Daniel v. Tolon, 53 Okla. 666, 157 P. 756.

In this case has there been the fullest and fairest explanation and communication of every particular resting in the breast of the children relative to the deed appearing on its face to be an absolute warranty deed and which by their answer they admit creates a trust relationship? Was the general warranty deed made and antedated under the circumstances under which the record shows it to have been executed and acknowledged by the notary public for the purpose of protecting the old Sac & Fox Indian from having his property taken away from him by a young wife, or was the deed executed for the purpose of placing the bonus money in the hands of the four children to maintain them and permit them to receive one-eighth of all oil and gas produced on this land and granting the notary public a mineral interest in 70 acres of the land? This question was presented to the trial court and is presented on appeal to the court. I do not feel that the findings of the trial court answered the same; neither do I feel that it is answered by the majority opinion.

It is stated that the plaintiff cannot set aside the conveyance for the reason the parties are in pari delicto, and for the further reason that by his testimony in the divorce suit he is estopped to question the transaction.

"The rule is well settled, especially as to executed contracts, that if the parties be in 'pari delicto' they will be left where they have placed themselves. They do not come into court with clean hands. If, however, one party is but an instrument in the hands of another, then they cannot be said to be in pari delicto. * * * In Story's Eq. Jurisprudence, vol. 1, sec. 300, the learned author says: 'And indeed, in cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto; for there may be, and often are, very different degrees in their guilt. One party may act under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age, so that his guilt may be far less in degree than that of his associate in the offense.'" Rozell v. Vansyckle, 39 P. 270, 272, 11 Wash. 79; Words & Phrases (First Series) vol. 4, p. 3478.

In this case the plaintiff contended that he conveyed his property to his children, the defendants, upon their solicitation and under an agreement with them that they would reconvey the same to him after the divorce and alimony question was settled between him and his third wife. The defendants plead a trust agreement, as before stated, but claim the terms were materially different from the facts pleaded by the plaintiff. Upon the issue tendered by the answer, that the plaintiff was estopped by reason of the fact that it was the intention of the grantor thereby to create a secret trust with the beneficial interest in himself for the purpose of defrauding a third party, his wife, by the appearance of the record that the entire title was owned by the grantees. While this is the general rule, I am of the opinion that the facts in this case bring the same within the exception to or limitation of the rule as stated by the author in 21 Corpus Juris, 184, under the head of "Limitations of the Rule," at page 189, as follows:

"The maxim being one founded on public policy, public policy may require its relaxation. Even when the parties have been found to be in pari delicto, relief has at times been awarded on the ground that in the particular case public policy has been found to be best conserved by that course.

"The conduct of the other party may be sufficient to prevent the maxim from being applied, as where plaintiff's misconduct toward defendant was invited by him, or waived. The courts incline to measure the comparative guilt of the respective parties and extend relief to one who is comparatively innocent. This situation has usually been presented in cases in which the wrongful conduct of the party seeking relief has arisen through undue influence arising from a trust relationship of the parties, through mental weakness, threats, fear, or oppres-

sion and like circumstances which have been regarded as sufficient measurably to excuse the wrongful conduct involved."

As was said by this court in Cosden Oil and Gas Company v. Hendrickson, 96 Okla. 206, 221 P. 89; in the body of the opinion the court uses the following language:

"Instead of paying or tendering back the $7,000 consideration, they have, on the contrary, contended that they had the right to keep it, claiming it to be a payment under mistake of law. If such be the fact, the defendant, Eliza Fugate, nee Hendrickson, having been a party to the transaction, which we have declared as against public policy, is surely not a party who can claim a greater right to recognition in a court of equity than the plaintiff and her codefendants, having knowingly accepted benefits from the consideration of the transaction, can hardly be declared without fault. Without a doubt, were such parties attempting to come originally into a court of conscience with such a claim as they assert, they would be dismissed without delay. Eliza Fugate does not come in with 'clean hands,' and her codefendants, far from offering to do any equity, refuse on technical legal grounds.

"Usually, where both parties are in an inequitable position, the doctrine, 'In pari delicto melior est conditio possidentis' (Where parties are equally at fault, the situation of the possessor is the better one), is applied, and the court will refuse to interfere, leaving them where they placed themselves. But this doctrine is founded on public policy, and public policy sometimes requires its relaxation, 21 C. J. 189, sec. 175. For instance, the courts will not aid in carrying out an illegal transaction, and equity will sometimes interfere to prevent a greater offense against public morals and good conscience. Saylor v. Crooker, 97 Kan. 624, 156 Pac. 737, Ann. Cas. 1918D. 473; Hobbs v. Boatright, 195 Mo. 693, 93 S. W. 934, 5 L. R. A. (N. S.) 906 and note, 113 Am. St. Rep. 709.

"Such a situation, we believe, exists in this case. To refuse to interfere would, in effect, condone the reprehensible transaction between plaintiff and the guardian. Therefore this court will attempt to administer the equities of the parties as they appear, to prevent unnecessary injustice and prevent the creation of an inequitable situation."

For the reasons above stated, I most respectfully dissent. I am authorized to state that Mr. Justice RILEY concurs in the views herein expressed.

Note.—See under (3) 2 R. C. L. 203; R. C. L. Perm. Supp. p. 376.