## BEVERLY HILLS NAT. BANK & TRUST CO. v. MARTIN, Trustee, et al.

No. 28428.    Jan. 17, 1939.

Rehearing Denied June 13, 1939.

Yancey, Spillers & Bush and Alton & Ratcliff, for plaintiff in error.

Eben L. Taylor, for defendant in error.

DAVISON, J. This action was commenced in the district court of Tulsa county on April 8, 1937, by L. J. Martin, as plaintiff, against Charles A. Bliss and the Beverly Hills National Bank & Trust Company, a corporation, with its principal place of business located in California, as defendants. The action was one of interpleader in which the plaintiff alleged his possession of 125 shares of stock of the Moore Oil Company and asserted the existence of conflicting claims thereto by the defendants. The stock formerly belonged to Cora Bliss Funk, who died on the 5th day of January, 1937.

The defendants filed appropriate pleadings stating the basis of their respective claims. The bank asserted ownership of the stock as executor of the estate of Cora Bliss Funk on the theory that the same had been pledged by the testatrix during her lifetime to secure an indebtedness of $7,500 owing her half brother, the defendant Charles A. Bliss. The defendant Bliss sought to prevail on the theory that the stock had been placed with L. J. Martin in trust to be delivered to him at the death of Cora Bliss Funk subject to an unexercised right of revocation by said Cora Bliss Funk.

The cause was tried to the court on the 30th day of June, 1937. The bank introduced its proof, and at the conclusion thereof the defendant Bliss demurred to the evidence and moved for judgment. The demurrer and motion were sustained by the court and judgment entered accordingly. The bank

presents the cause to us on appeal as plaintiff in error.

Since our review of this cause necessarily involves a review of the evidence introduced before the trial court, it is important to recognize at the outset the standpoint from which we review the proof. This case, in its dominant aspects, is one of equitable cognizance. In such a case, upon demurrer to the evidence the proof favorable to the demurrant or challenging party is not to be disregarded as in a law case. On the contrary, the evidence before the court is to be weighed, and if from the evidence produced it appears that the demurring party is entitled to prevail, judgment should be entered in his favor. Thus, a demurrer to the evidence in a case of equitable cognizance is recognized and treated as a motion for judgment. A judgment rendered on such motion is not subject to reversal in this court unless it is against the clear weight of the evidence, Connelly v. Gaffaney, 159 Okla. 60, 14 P.2d 391; Penny v. Vose, 108 Okla. 103, 234 P. 601.

Bearing in mind the scope of our review as well as the test by which the trial court was governed in entering its judgment, we now direct our attention to the salient facts developed by the proof.

This cause must be determined upon the legal effect of an agreement executed on the 5th day of May, 1936, which was styled a trust agreement. It reads:

"Exhibit A This Agreement, made and entered into on this 5th day of May, 1936, and executed in triplicate between Cora B. Funk, of Los Angeles county, state of California, hereinafter called the grantor, and L. J. Martin, hereinafter called the trustee.

"Witnesseth:

"1. The grantor in consideration of One Dollar ($1.00) paid to her by the trustee, receipt of which is hereby acknowledged, has delivered to the trustee the following described personal property, to wit:

"One hundred twenty-five (125) shares of the common stock of the Moore Oil Company, a corporation organized under the laws of the state of Oklahoma, which said shares of stock are to be held by the trustee or his successor in trust for the purposes hereinafter set forth.

"2. The trustee shall receive, own, and manage said shares of stock voting the same in all meetings of the stockholders of said company as in his discretion shall be deemed to be for the best interest of the beneficiary hereunder to the same extent as the grantor, herself, might do; that he is not to sell said stock or dispose of the same during the continuance of this trust, but he is to participate

in the business of the Moore Oil Company the same as the donor, herself, might do.

"3. The trustee shall administer this estate for the following uses and purposes:

"(a) All of the dividends received from said stock shall be paid by the trustee to the donor, Cora B. Funk, during her lifetime.

"(b) After the death of the said Cora B. Funk the said one hundred twenty-five (125) shares of stock shall be delivered to, and become the property of, Charles A. Bliss, the brother of the said donor, and in case of the death of the said Charles A. Bliss prior to the death of Cora B. Funk, then the said shares of stock upon the death of Cora B. Funk shall be delivered to and become the property of the devisees or heirs at law of the said Charles A. Bliss.

"4. This trust has been accepted by the trustee in the state of Oklahoma and all questions pertaining to its construction and validity are to be construed in accordance with the law of the state of Oklahoma.

"5. Each beneficiary hereunder is hereby restrained from anticipating, encumbering, alienating or in any other manner assigning his or her interest or estate in either principal or income, and is without power so to do, nor shall such interest or estate be subject to his or her liabilities or obligations, nor to judgment or other legal process, bankruptcy proceedings or claims of creditors or others.

"6. The donor, Cora B. Funk, retains the right at any time to terminate this trust by paying to the trustee for the use and benefit of Charles A. Bliss, his heirs, executors or administrators the sum of $7,500, which said sum shall be paid over to the said Charles Bliss, his heirs, executors or administrators, and upon such payment being made this trust shall terminate and the trustee shall deliver and transfer the said one hundred twenty-five (125) shares of the common stock of the Moore Oil Company, to the donor, Cora B. Funk, and upon the payment of the said sum of $7,500 to the said Charles A. Bliss, any and all claims, demands and charges of whatever kind and nature the said Charles A. Bliss may have against Cora B. Funk, whether legal or equitable, shall thereby and thereon be fully discharged and paid in full.

"7. As a compensation for his services the trustee shall receive such amount as may be hereafter mutually agreed upon by and between the donor and the trustee, provided that at the termination of this trust the trustee, shall receive two per cent. of the then market value of the said stock for the settling up and distributing of said trust estate.

"8. It is mutually agreed that these presents shall extend to and be obligatory upon the executors, administrators, legal representatives and successors, respectively, of the parties hereto.

"9. That the donor herein shall pay or cause to be paid any and all taxes of whatever kind or nature, including income taxes, both federal and state, and any and all listing of said stock for taxation purposes shall be made by the donor, and the trustee shall be reimbursed for any and all taxes, claims or charges which he may be required to pay for or on account of such trusteeship.

"10. This trust agreement shall be executed in triplicate, each one of which shall be considered an original; one to be held by the grantor, Cora B. Funk, one by the trustee, L. J. Martin, and one by Charles A. Bliss.

"In Witness Whereof, the grantor, Cora B. Funk, has hereunto set her hand the day and year first above written and the trustee, L. J. Martin, in acceptance of the trust herein created has set his hand the day and year above written.

"Cora B. Funk<br>
"Grantor.

"L. J. Martin<br>
"Trustee.

"I, Charles A. Bliss, do hereby certify that I am fully conversant with the foregoing trust agreement, that upon payment of the sum therein set forth or upon the transfer and delivery of the stock as therein set forth, any and all claims and demands which I may have against Cora B. Funk will be paid, satisfied and discharged in full.

"Charles A. Bliss."

This agreement, the bank contends, was in reality a pledge to secure the payment of a debt in the sum of $7,500. This position entitled it to introduce evidence for the purpose of showing the instrument to be one of security. In view of the nature of the claim made by the bank, the right to introduce extraneous evidence on the point did not depend upon the existence of an ambiguity in the instrument. It is established law that any instrument of conveyance, no matter how absolute in form, may be established as a mortgage or instrument of security if it was so intended by the parties. Fred Balduff et ux. v. Onan F. Griswold, 9 Okla. 438, 60 P. 223; Rives, Trustee, v. Mincks Hotel Co. et al., 167 Okla. 500, 30 P.2d 911; Worley, Receiver, v. Carter et al., 30 Okla. 642, 121 P. 669; Beindorf v. Thorpe et al., 90 Okla. 191, 203 P. 475; Taylor et al. v. Campbell, 139 Okla. 110, 281 P. 243; Perry on Trusts & Trustees, vol. 2, p. 1022. The proof, however, must be clear, cogent, and convincing, Embry v. Villines, 175 Okla. 552, 53 P.2d 277; Holly v. Holly, 174 Okla. 626, 51 P.2d 527; Murphy et al. v. Knox et al., 178 Okla. 436, 63 P.2d 98.

In order to show the foregoing instrument and the deposit of stock in connection therewith was intended as a pledge to secure the payment of a debt as distinguished from a trust, extrinsic evidence was introduced from which the following facts appear.

The stock deposited with Martin, who is styled trustee, was of the value of $25,000. Prior to the execution of the trust agreement the defendant Bliss was in possession of the stock in question together with other stocks which were the property of the testatrix. The testatrix was indebted to the defendant in the sum of $7,500 at one time.

The testatrix, who lived in California, employed L. J. Martin, a Tulsa lawyer, who was then a sojourner in California, as her attorney to procure the return of the stocks, advising him at the time that she intended to give Bliss one-half of the common stock at her death. On April 15, 1936, Martin wrote the testatrix as follows:

"April 15, 1936

"Mrs. A. L. Funk
"712 North Cresent Drive
"Beverly Hills, California

"Dear Mrs. Funk:

"We had a regular meeting of the Directors of the Moore Oil Company this morning. Charley was here from Arkansas City. It was the first opportunity I have had to go into your matter with him.

"After the meeting I called him down to the office and told him what you wanted, that is, that you wanted the Wire Rope stock sent to you and also for him to put the stock of the Moore Oil Company which he had back into your name and that if he insisted you would pay him what you owed him, which was $1,000 paid to Dr. Nelson; $420.00 for taxes; and $500.00 for the Akdar Temple stock, amounting altogether to $1,-920.00. He was very much up set in regard to the matter and said he would not do anything of the kind, as he claimed there was at least $2,080.00 due him for the services which he had rendered the last three years, $2,500.00 in the Connelly matter and $1,000 for the Arrowhead matter, amounting in all to $7,500.00.

"He said, however, he would take all of the 497 shares of the Union Wire Rope in full settlement of all claims against you and that he would resign at once, and said he was going up stairs and resign today. Or, he said he would take a note for $7,500.-00, bearing six per cent interest to run one, two, three or five years, to be secured by $7,500.00 worth of the common stock of the Moore Oil Company.

"I told him that I would submit these propositions to you, but I did not believe that you would want to accept any of them. I believe that the proper way to make this settlement on all the matters is as follows: I understand by your will you desire that he shall receive one-half of the common stock of the Moore Oil stock upon your death and the income from one-half of the stock is to go to your husband, A. L. Funk, during his lifetime and upon his death the stock was to go to certain other parties.

"Now, I know Charley would be perfectly well satisfied if you would make a trust agreement, putting in the trustee's hands one-half of the common stock of the Moore Oil Company upon which you were to receive all dividends during your lifetime and after your death the stock to go to Charley. In case of his death before your death the stock would go to his heirs upon your death. If this is done he will sign over all of the Wire Rope stock to you and all of the Moore Oil stock, both preferred and common, and you would not have to pay him anything at all, but he would receive his pay after you die in this stock and you would receive all the dividends on all this stock, both preferred and common, as long as you live.

"You could, if you so desire, include in the agreement all of the stock of the Moore Oil Company, both the preferred and common, or the common stock alone, and provide in the trust agreement that all the dividends received from the stock should go to you until your death; upon your death one-half of the common stock to go to Charley and the income from one-half of the common stock to go to your husband during his lifetime and upon his death to go to whomever you desire. This would make it so that you would not have to bother in attending to this property and would be perfectly safe.

"I strongly advise that such a procedure be carried out in this manner in order to get this settlement made. It would be better to have the trustee someone living here, either a trust company or an individual, and in view of the fact that trust companies have not been successful as they should have been here, I would advise a private individual upon whom you could depend. You could, if you so desired, require the trustee to put up a bond to carry out the trust agreement.

"Let me know upon the receipt of this letter what you desire to be done and if you so wish I shall draw up such trust agreement and send it out to you for examination and approval.

"We are having very hot and dry weather here and have had no rain since about December. With kind regards to both of you I remain.

"Yours most truly,
"LJM :FBF          "L. J. Martin"

The testatrix replied on May 5th as follows:

"May 5th, 1936

"Judge L. J. Martin,
    "Tulsa, Okla.

"Dear Judge:

"I have considered all of Charley probisitons (sic) and think the best thing to do would be to put in a trust one-half of the Moore Company common stock to be delivered to him after my death. I to receive all dividens (sic) from said stock as long as I live. He to return all stock he has of mine an (sic) cancel all debts I would like the Conley stock but do not let this stand in the way as it is not worth a dime at present. Under the circumstances think he would be foolish to resine (sic) from the board of directors. Happy to say that we are both feeling better. With kindest regards

"Your Resp.

"Cora B. Funk"

On May 8th Martin answered. Among other things, he advised her as follows:

"I would also put in a reservation by which you could terminate the trust upon payment to Charlie of so much money. I shall see Charlie the 14th."

On May 11th she answered accepting the advice, and on May 21st the trust agreement, supra, was forwarded to her. It was executed and returned to Tulsa, where the signature of Charles Bliss was affixed to the latter portion of the instrument.

On the 29th day of May, 1936, Cora Bliss made a will which contained the following provision:

"(J) I purposely am not making any bequest to my half-brother, RUSSELL B. BLISS, OR MY half-brother, CHARLIE A. BLISS, because I have remembered them during my lifetime."

Other evidence, which need not be reviewed in detail, tends to show that, subsequent to the execution of the foregoing trust agreement, Mrs. Funk made statements alluding to the $7,500 provided as a condition to revocation in the trust agreement as though it were a debt. There is some question about the admissibility of this evidence which we deem it unnecessary to discuss, since, even though properly admissible, we deem its probative force insufficient to warrant a disturbance of the trial court's judgment. This in view of the rule (mentioned supra) that the weight of the evidence was a matter of proper cognizance on motion for judgment at the close of the bank's evidence.

The bank urges that the disparity between the value of the property placed with the trustee, Martin, and the sum denominated as a condition to revocation of the trust, identifies the transaction as one of pledge. It is true that in many cases disparity between the value of property and the consideration constitutes an important element in determining the nature of the transaction. The argumentative force of such disparity is in this case destroyed by the explanation apparent from the instrument and reflected by the correspondence preceding its execution. It is quite apparent that the donor in creating the trust intended her half brother to benefit by the excess value upon her death. Thus, the difference in value is not inconsistent with the purpose to be accomplished by the trust, but rather in furtherance thereof.

The bank urges "that the stocks were placed with L. J. Martin as pledge holder as security for an antecedent debt," and that "the instrument on its face, in view of the debt, shows that the transaction was one of security and falls within the prohibition of the statute on liens."

The difficulty encountered in approving either of these propositions lies in the fallacious assumption of the continued existence of the debt after the execution of the trust agreement. A debt connotes the right of creditor to collect as well as the duty of the debtor to pay. That such a relationship did exist between the parties prior to the trust agreement is conceded. But one of the purposes of the transaction was to terminate that relationship. Mrs. Funk urgently and successfully insisted that she be relieved of the duty to pay and Charles Bliss specifically relinquished his right to collect. Thus the debt was superseded by what may be termed a conditional right of revocation comparable to a right to repurchase. The distinction is clear-cut and of controlling importance. Thus it is said in 41 C. J., page 326 (article on Mortgages):

"If it is a debt which the grantor is bound to pay, which the grantee might collect by proper proceedings, and for which the deed of the land is to stand as security, the transaction is a mortgage; but if it is entirely optional with the grantor to pay the money and receive a reconveyance or not to do so, he has not the rights of a mortgagor, but only a privilege of repurchasing the property. * * *"

We conclude, as did the trial court, that subsequent to the execution of the trust agreement the debt was extinguished. The prior relationship of debtor and creditor no longer existed. It had merged into another and different relationship.

The bank also urges that the existence of the clause in the trust agreement authorizing the settlor to revoke the same upon payment of $7,500 is in itself sufficient to conclusively establish the character of the instrument as one of pledge or mortgage as distinguished from a true trust. In support of this assertion our attention is called to certain language employed in the text of Bogert on Trusts, at page 146, sec. 29, of vol. 1. The portion of the text alluded to is not in point in this case for the reason that the learned author is there dealing with a specific question of the law of trusts, namely, the narrow and limited problem of distinguishing between "a trust deed in the way of a mortgage and a trust to sell for creditors," both of which comprehend the continued existence of a debtor and creditor relationship, and are thus in this controlling feature not comparable to the transaction and instrument now before us, where, as we have seen, that relationship has been extinguished.

The able work (Bogert on Trusts) at page 2900, sec. 994, more nearly approaches the precise question involved in the case at bar. There it is said:

"* * * So likewise the settlor may by express provision vest in himself a power to revoke or cancel the trust at will, or on the happening of a certain contingency. He may provide that he shall have the right to buy back the trust property at a valuation, if a certain event happens. Such a reservation of a power to revoke does not affect the validity of the trust. It merely makes the interests of the trustee and cestui defeasible at the desire of the settlor."

In Restatement of the Law, Trusts, P. 990, it is said:

"The reservation by the settlor of a power of revocation does not of itself make the trust invalid or incomplete."

The bank does not call our attention to any authority holding that the mere imposition of a condition, such as the payment to the cestui of a stipulated sum on the power to revoke, changes the effect of such power on the validity of the trust.

We conclude that, as against the objections presented by the bank, the instrument now before us created a valid trust. The question of whether the instrument was or is in fact an attempted will and therefore invalid because not executed in accord with the statute of wills, is not presented, and therefore not treated or considered in this opinion.

Under the provisions of the trust agreement, the defendant Bliss was entitled to the stock upon the death of the testatrix. Since that was the time fixed for the vesting of the full title to the property, the option to repurchase expired at that time. The trial court so held. Its judgment is affirmed.

BAYLESS, C. J., WELCH, V. C. J., and OSBORN and GIBSON, JJ., concur.